56 CCPA

**Application of Kurt WEBER, Hansruedi Rickenbacher and Ulrich Meister.**

**Patent Appeal No. 8090.**

United States Court of Customs and Patent Appeals.

Feb. 6, 1969.

Harry Goldsmith, Bryant W. Brennan, Joseph G. Kolodny, Summit, N. J. (A. Ponack, Wenderoth, Lind & Ponack, Washington, D. C., of counsel), for appellants.

Joseph Schimmel, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, ALMOND and BALDWIN, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals af-

firming the final rejection of claims 1, 2 and 6 of appellants' application entitled "Process for Dyeing and Printing Synthetic Fiber Material."[1] No claims have been allowed.

■ The invention relates to a process of dyeing and printing synthetic fiber material, especially polyesters such as polyethylene terephthalate, to obtain strong, full dyeings and prints said to possess excellent properties of wet fastness and an excellent fastness to light and sublimation.

The process involves applying to the polyester fibers with heating an aqueous dispersion of certain defined aminobenzoylaminoanthraquinone dyestuffs. The aqueous dispersion is made by mixing the finely divided dyes which can be obtained by grinding the dye with any well known dispersing agent such as soap or sulfite cellulose waste liquor and diluting with water.

Claims 1 and 6 are illustrative:

1. A process for dyeing and printing polyalkylene terephthalate fibers, wherein the fibrous material is heated with an aqueous dispersion of a dyestuff of the formula

X    O    NHCOR

X    O    X    Y

in which formula R represents a benzene radical, and at least one X represents a member selected from the group consisting of hydrogen atoms, amino groups, lower alkanoyl amino groups, a lower alkoxy group and a halogen atom, and the other symbols X represent hydrogen atoms, and Y

is a member selected from the group consisting of hydrogen, halogen, lower alkyl, lower alkoxy, phenoxy, lower alkylmercapto, nitro, cyano, acetyl and lower carbalkyl groups.

6. Polyalkylene terephthalate fibers dyed with a dyestuff of the formula

in which formula R represents a benzene radical, and at least one X represents a member selected from the group consisting of hydrogen atoms, amino groups, aliphatic and cycloaliphtic acylamino groups and acylamino group derived from a semiester of carbonic acid, an alkoxy group and a halogen atom, and the other symbols X represent hydrogen atoms.

The claims were rejected by the examiner under 35 U.S.C. § 102. The reference relied upon is:

Mautner    2,876,061    March 3, 1959

The references [2] relied upon below by appellants are:

Lubs, H. A., The Chemistry of Synthetic Dyes and Pigments, 1955, pages 417 and 420.

Venkataraman, K., The Chemistry of Synthetic Dyes, Vol. 2, 1952, pages 872 and 882.

Mautner discloses the treatment of ordinarily water-insoluble pigments to render them water soluble and useful for dyeing materials from aqueous solutions

---

1. Serial No. 452,864 filed May 3, 1965.

2. The reference Lubs, while cited in the examiner or board but appears in the was not discussed there nor in the record and briefs before us and accordingly we shall not discuss it further. Page 872 of Venkataraman was not cited by the examined or board but appears in the printed record and is discussed by the parties in their briefs.

thereof. Included among substances disclosed as representative of ordinarily water-insoluble pigments containing a reducible and salt-forming group which may be solubilized in accordance with Mautner's process of treatment with caustic alkali in a water-soluble polyhydric alcohol solvent are the dyestuffs 1 –amino– 5 –benzoylaminoanthraquinone and 1 –amino– 4 –benzoylaminoanthraquinone. The patentee states that the addition of the caustic alkali to the dyestuff dissolved in the polyhydric alcohol was usually accompanied by a change in color, generally attributed to reduction and salt formation of the dyestuff. The addition of water to the concentrate to prepare either a stock solution or aqueous dye bath is said to be usually accompanied by a reversal to the original color of the pigment indicative of oxidation. Failure to use caustic alkali is said to result in reprecipitation of the pigment upon addition of water. Included among the fibrous materials dyed by the patentee's dyestuffs is Dacron (polyethylene terephthalate).

Venkataraman discloses that acylamidoanthraquinones are usually prepared by treating the amine (the amidoanthraquinone) with the acid chloride in boiling nitrobenzene for a few hours. It is stated that there is little danger of hydrolysis of the arylamido groups under hot dyeing conditions. Vat dyeing with anthraquinone is disclosed as being carried out at temperatures of 50–60° in the warm process.

It was the position of the examiner that the claims were fully met by Mautner and that appellants' affidavit purporting to show that the Mautner alkali treatment causes the benzoyl group of the aminobenzoylaminoanthraquinone to split off, resulting in dyeing with a diaminoanthraquinone not within the appealed claims, was unconvincing because of certain alleged inconsistencies between the affidavit and Mautner. In affirming, the board expressed full agreement with the examiner's rejection and stated:

As pointed out by the Examiner, the affidavit of January 18, 1966 is completely at variance with the specific teachings of Mautner, does not comply with the process parameters therein set forth and is not persuasive that the benzoylamino anthraquinone of Mautner known to be difficultly hydrolyzable would be hydrolyzed under the reaction conditions to produce a diamino-anthraquinone which does not comply with appellants' claims.

* * *

Not only does Venkataraman teach the stability toward hydrolysis of amidoanthraquinones but Mautner itself clearly indicates that the amide group is not hydrolyzed. * * * it is clearly taught that the substituted aminoanthraquinone when treated with caustic alkali and polyhydric alcohol changes color in a manner generally attributed to reduction and salt formation. To the dyestuff chemist this implies formation of the salt of the leuco form (that is, the hydroquinone form) of the anthraquinone dyestuff. The positive teaching that the addition of water is usually accompanied by reversal to the original color indicates, as pointed out therein, oxidation of the dyestuff to its original anthraquinone form. Since the original color is reproduced, it is quite clear that appellants' postulated hydrolysis could not have occurred. The affidavit and argument based thereon is, therefore, not persuasive that the disclosure in the U. S. patent to Mautner is in error.

That the affidavit indicates the caustic-treated anthraquinone to be precipitated in cold water is also contra to the specific teaching in Mautner that the addition of cold water produces a solution of the original color to be employed in the subsequent process of dyeing. It is, therefore, further apparent that the contended hydrolysis does not occur in Mautner. The dyestuff solution and the dyeings

in Mautner, in our opinion, therefore, correspond exactly with those herein claimed.

Resolution of the issue of whether the claimed invention is identically disclosed or described as set forth in 35 U.S.C. § 102 by Mautner requires determination of the more specific factual questions of whether, based on the evidence of record before us, it can be reasonably concluded that (1) Mautner's dyeing from aqueous *solutions* provides no more than a negligible difference from appellants' dyeing from aqueous *dispersions* and (2) Mautner dyes with an amino-benzoylaminoanthraquinone rather than a diaminoanthraquinone. Both of these questions are present in the process claims but the claim drawn to the dyed fibers, being silent on the manner of applying the dyestuff, concerns only the latter.

Appellants argue that Mautner fails to disclose their process since the patentee uses an aqueous *solution* of the dyestuff whereas appellants employ an aqueous *dispersion*.[3] They point out that Mautner's invention is directed to the *solubilization* of pigments contrasted with appellants' process of *dispersing* their pigments. The solicitor responds by contending that the difference between using an aqueous dispersion or an aqueous solution of the dyestuff is so negligible that it cannot impart patentability to the claims which are otherwise fully met under 35 U.S.C. § 102.

We cannot accept the solicitor's argument. That there is more than a negligible difference in the type of dyeing bath used is evidenced by Mautner's disclosure that:

A large proportion of the substances now available for coloring purposes are not soluble in water and must be treated in diverse manners in order to disperse them in aqueous media suitable for dyeing. * * * The resulting dispersions have a highly alkaline character which limits their usefulness * * *. Further, these dispersions are unstable and settle out in some cases after about ten minutes' standing * * *.

And his statement that:

It is an object of the instant invention to provide a means for rendering ordinarily water-insoluble pigments water soluble.

Mautner cannot, therefore, serve to fully meet appellants' claimed process and accordingly the board's decision affirming the rejection of claims 1 and 2 is reversed.

Claim 6 presents a different question since there is no contention that the product differs solely because the dyestuff is applied from an aqueous dispersion rather than from an aqueous solution. However, appellants contend that Mautner's solubilization procedure decomposes the benzoylaminoanthraquinone dyes to aminoanthraquinone dyes which are not encompassed by the language of the appealed claim. In support of this contention appellants have submitted an affidavit purporting to establish, by comparative tests, that debenzoylation occurs in Mautner's solubilization process.

3. The Condensed Chemical Dictionary, Reinhold Publishing Corp., New York, Sixth Edition, 1961, defines "dispersion" and "solution" as follows:

*dispersion.* A system of minute particles (solid, liquid, or gaseous) distinct and separate from one another and suspended in a liquid, gaseous, or solid medium. Usually applied as descriptive of colloidal particles (diameter 1–100 millimicrons) suspended in a suitable medium. Examples of dispersions: smog, homogenized milk, gels.

*solution.* A true solution is a homogeneous mixture of two or more substances that has the following characteristics: (1) spontaneous formation; (2) subdivision down to molecular magnitudes; (3) absence of settling; and (4) no fixed proportions of the component substances. The best known examples of solutions are cases in which solids are dissolved in liquids (salt or sugar in water) but solutions of liquids in liquids, gases in liquids, gases in solids and solids in solids are also known.

Appellants' affidavit shows the use of three dyestuffs in comparative tests. The first is commercially available 1–amino – 4 – benzoylaminoanthraquinone. The second is that said to be produced according to the process of Mautner by pasting 1 gram of 1–amino–4–benzoyl-aminoanthraquinone with 20 cc. of diethylene glycol at 220–250° F., resulting in a solution to which was added 0.25 grams of dry caustic potash with continued heating with concurrent mixing. The volume was then made up to 1 liter by adding cold water "whereby the dyestuff flocked out." The third dyestuff is 1,-4–diaminoanthraquinone, a commercially available product.

Dacron was dyed in a dye bath in which the preparation obtained from grinding 1 part of dyestuff with 1 part of sulfite cellulose waste liquor had been dispersed. According to the affidavit, dyestuff No. 1 gives a bluish-red dyeing which is fast to sublimation. The same dyestuff applied according to Mautner resulted in a violet dyeing of poor fastness to sublimation as did dyestuff No. 3.

Thin layer chromatography tests were conducted with the three dyestuffs with the result that dyestuffs 1 and 2 traveled different distances in the chromatogram while dyestuffs 2 and 3 traveled approximately the same distance. From this, the affiants concluded that dyestuffs 1 and 2 are chemically different while 2 and 3 are each 1,4–diaminoanthraquinone.

The examiner found the affidavit unconvincing "since the preparation of dye 2 is not in accordance with Mautner as alleged. The affidavit shows the dyestuff to be 'flocked out' while Mautner clearly prevents the dyestuff from precipitating." The board agreed and found that the affidavit "does not comply with the process parameters [of Mautner]."

Appellants seek to rebut this position by contending that the affidavit includes all, but no more than, that which is set forth in the reference and proceed to present detailed technical argument in support of their chemical theory that debenzoylation occurs in Mautner's solubilization procedure. The solicitor counters by arguing in support of the board's view that, rather than debenzoylation, Mautner implicitly teaches that the caustic alkali and polyhydric alcohol treatment results in "formation of the salt of the leuco form (that is, the hydroquinone form) of the anthraquinone dyestuff."

We do not consider it necessary to choose between these competing theories of dyestuff chemistry. Rather, we find it significant that the total thrust of Mautner's invention, as we pointed out above, is to obtain solutions where formerly only dispersions were obtainable. The patentee solubilizes ordinarily water-insoluble pigments, such as 1–amino–4–benzoylaminoanthraquinone and by the use of caustic alkali prevents precipitation of pigment upon addition of water. In the experiment described in appellants' affidavit the dyestuff is said to be "flocked out," the very result that Mautner claims to avoid by his procedure, yet no further experiments were attempted.

We do not think that appellants' mere showing that it is possible to operate within Mautner's disclosure without obtaining his results is sufficient to overcome the strong presumption that the process of a patent if used by one skilled in the art will produce the results alleged by the patentee. In re Michalek, 162 F.2d 229, 34 CCPA 1124. The affidavit is, therefore, inconclusive in showing that Mautner dyes with a diaminoanthraquinone rather than the aminobenzoylaminoanthraquinone expressly disclosed. The decision of the board affirming the rejection of claim 6 is affirmed.

Modified.