**In re James D. REUTER, Edwin D. Vickery, and William J. Everett, Jr.**

**Appeal No. 80–604.**

United States Court of Customs and Patent Appeals.

June 18, 1981.

Joseph F. Nakamura, Sol., Thomas E. Lynch, Associate Sol., Washington, D. C., for Patent and Trademark Office.

Frederick A. Zoda, Trenton, N. J., atty., for appellants.

1. United States Patent No. 3,428,277, issued February 18, 1969.

2. United States Patent No. 2,723,094, issued November 8, 1955.

3. *The Barish Sailwing*, Sky Diver, p. 20 (October 1965).

4. The '613 patent issued August 18, 1970, from application serial No. 719,313, filed April 8, 1968, for "Flexible Gliding Wing," as a continu-

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This appeal is from a decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") which affirmed the examiner's rejections of claims 1 and 3–11 as unpatentable under 35 U.S.C. § 103 over Everett[1] in view of Berckmuller[2] and claims 2 and 12 over Everett in view of Berckmuller and Barish[3] in reissue application serial No. 887,103, filed March 16, 1978, for "Flexible Gliding Wing." The board stated that its decision was reinforced by an affidavit of Poynter and a deposition of Vickery. We affirm.

Procedural History

Appellants' assignee, Pioneer Parachute Company, Inc., filed suit for infringement of Patent No. 3,524,613[4] ('613) in the United States District Court for the District of New Jersey on May 19, 1976, identified as *Pioneer Parachute Company, Inc. v. Para-Flite, Inc.*, Civil Action No. 76–0932. Several matters were raised by the defendant before the district court including prior art not previously considered by the PTO. After the reissue application was filed, the district court granted a temporary stay of proceedings on April 21, 1978, to permit consideration of the reissue application by the PTO. For purposes of the litigation, appellants' assignee agreed to be bound by the decision of the examiner. After final rejection of the claims by the examiner, an order dismissing the infringement suit with prejudice was entered on October 24, 1979. Although the protester, Para-Flite, Inc., ac-

ation-in-part of application serial No. 615,487, filed February 13, 1967, now United States Patent No. 3,428,277 ('277). The application underlying the '277 patent was filed by William J. Everett, Jr. as a sole inventor, and the '277 patent has been applied by the PTO as the primary reference here. Appellants admit "that what Everett did before [their] reduction to practice [is] prior art."

tively participated in the reissue proceedings before the examiner under authority of 37 CFR 1.291, it withdrew from the reissue proceedings after the infringement suit was dismissed and before the appeal in this case was heard by the board.

The Invention

The invention relates to a self-inflating, flexible gliding wing ("wing") for lowering a suspended object through the air. It achieves the same result as a parachute but operates in a different way. A parachute slows gravitational movement by resistance of the air confined within the dome formed by the fabric. In contrast, the wing acts as an airfoil creating lift as the air passes across the wing, i. e., from the leading to the trailing edges of the wing surface. Figures 1 (a perspective) and 2 (a transverse or front elevation) are illustrative:

Fig. 1.

Fig. 2.

The self-inflating characteristic is attained by forming ram air scoops adjacent the leading edge (14) of the wing. The ram air scoops prevent inward buckling of the leading edge. The invention differs from prior art wings in its utilization of a *more pronounced* transversely arched contour, which is obtained by employing suspension lines (6) substantially equal in length in each transversely extending row of lines (e. g. 6a). According to appellants, the equal line length feature more evenly distributes the forces exerted on the suspension lines at the load points (12) and prevents downward buckling of the central portion of the wing. Claim 1 is representative:

1. A flexible and inflatable gliding wing comprising upper and lower flexible members which are connected to one another at points between the leading and trailing edges of the wing, the leading edges of said members, upon inflation of the wing, being spaced apart vertically to permit the entry of air into the space there between, suspension lines connected to said wing and extending downward from the wing in converging relation to at least one point of attachment to a load, said suspension lines being arranged in longitudinally spaced and transversely extending rows with the suspension lines in each transversely extending row *being substantially equal in length and serving, during flight, to impart to said wing a contour which is transversely arched* with the center of curvature of said arched contour being the point of attachment of said suspension lines to a load. [Emphasis added.]

The Prior Art

The evidence in this case is of several types, including patents, a publication, and

statements made by way of affidavit and deposition. The '277 patent to Everett discloses a similar wing having ram air scoops to prevent downward buckling or inward folding of the leading edge and having suspension lines of *varied* lengths in transversely extending rows to impart a predetermined arched contour to the canopy in the transverse dimension. The patent to Berckmuller discloses a parachute designed to reduce operational altitude (that is, the altitude necessary for the parachute to open and function) by forming a multitude of minor parachutes or cells across the surface of a single canopy. The cells are connected to the user's harness by suspension lines of equal length resulting in a parachute having a substantially flatter dome than the usual inverted, cup-shaped parachute. The Barish publication discloses a wing having a three-lobed canopy comprising three transversely aligned sections. The front panels of each section are rolled under to form similar ram air scoops in the lower forward portion of the wing.

The Poynter affidavit was introduced during the reissue proceedings before the PTO. In pertinent part, Poynter states:

At Parachutes, Incorporated my primary responsibilies [*sic*] were sales and marketing. However, because of my interest in the design of parachutes and my responsibilities in marketing, I was intimately involved at Parachutes, Incorporated with the design and development of the parachute equipment to be marketed by Parachutes, Incorporated.

While at Parachutes, Incorporated I also designed and built numerous model gliding wing canopies which I tested in wind tunnels as well as by dropping the weighted models from elevated structures and airplanes.

By the summer of 1967, I had built no less than six complete model gliding wing canopies of various designs.

Sometime prior to October 26, 1966, I built and [illegible] fabric) consisting of a substantially air-foil shape with upper and lower surfaces, a closed trailing edge, six ribs dividing the space between the upper and lower surfaces into five cells and with openings at the leading edge. Attached to the underneath side of the canopy were catenary structures for line attachment to which were attached two rows of six suspension lines each. The canopy, catenary structures and suspension lines were arranged to impart a spanwise curvature to the canopy. Photographs of the model canopy are attached hereto as Exhibit A.

On or about October 20–25, 1966, I was requested to make three demonstration jumps of the Barish Sail-Wing at Wright-Patterson Air Force Base, Dayton, Ohio. Because of weather conditions, I made two of the jumps. At the time, I also took with me from Orange, Massachusetts, the model parachute shown in the photographs Exhibit A.

While at Wright-Patterson Air Force Base, I tested the model parachute by dropping it from the roof of a building numerous times at the parachute center in Xenia, Ohio. I observed that it flew and glided well.

Also while at Wright-Patterson, I tested the canopy in a wind tunnel. In fact, the photographs appearing in Exhibit A were actually taken of the canopy while under test in the wind tunnel.

The dates of the activities at Wright-Patterson Air Force Base and Xenia, Ohio, are established by my parachute jump log book, copy of which pertinent pages are attached hereto as Exhibit B.

At the time of the wind tunnel testing of my model canopy during October 20–25, 1966, it was well known that by increasing the aspect ratio of a gliding wing one could increase the performance, specifically the glide ratio.

It was known to me and others skilled in gliding wing type parachutes that there were three ways to maintain the spanwise integrity of higher aspect ratio non-rigid glide canopies:

(1) internal pressurization, such as that embodied in a double surface device;

(2) spanwise rounding of the flying surface in order to produce outward (wing tip to wing tip) forces; and

(3) angle the outboard catenary structures (below the lower surface) so that the leading edges of these sections are further apart than their respective trailing edges.

Some of the Barish Sail-Wings employed all three principles. My model wing shown in the photographs Exhibit A also employed all three principles.

Since Irvin obtained his patent(s) in the 1920's for his device for tensioning and marking parachute suspension lines in equal lengths, it was obvious to anyone in the industry that it is preferable from a manufacturing standpoint to use lines of equal length as opposed to lines of varying length, if at all possible, in manufacturing a parachute canopy.

Based upon the knowledge which I possessed and was possessed by others skilled in the art of gliding wing parachutes on or before October 20, 1966, the simplest and most obvious technique for imparting a spanwise curvature to a gliding wing canopy was to utilize equal line lengths for the suspension lines.

Vickery, a coinventor, was deposed during infringement proceedings before the district court and, on cross-examination, the following exchange was recorded:

Q. Did you give Mr. Reuter any input as to the exact degree of curvature or angle that should be assumed?

A. Only to the point that if you're going to change the lines, it sure would be nice if they're all the same length, because that would be a very convenient thing from the manufacturing standpoint and from the packing standpoint. So we decided to try that first and if that didn't give us any adverse problems, . . . then that would be the thing to do.

Q. Do you recall whether it was you who said that?

A. I don't, but that's one of those things that would be a pretty obvious thing to do. If they're going to change the line lengths, it sure would be nice for them to be equal. I think either one of us independently would have said let's make them the same length.

. . . .

MR. JACOBSON: Did you have something else to say, Mr. Vickery?

A. Well, a problem with the flat canopy, I can recall—I'm just going to pull a number out of the air, but it seems to me as if the Para-Foil canopy had 40 lines and 20 different line lengths, and that's a mess for manufacturing and for packing. And if you can go from 20 different line lengths to 4 different line lengths, that's just really nice. So it's a very obvious thing to do, in my mind, and I think it would have been in Jim's mind too. If you're going to change the line lengths, just make them all equal. Transversely, in a given row, make them all equal.

Q. Do you recall whether it was you who said that?

A. No, I do not.

Q. Do you recall any conversation between the two of you? Was it a discussion?

A. I really don't recall what happened once it was demonstrated that having it flat is not a good idea. He was convinced by seeing what happened in the air, so there was no opposition to my changing them then, not that there was before, and I just don't really recall if we discussed what length we should make them. I'm sure it was mentioned. By who, I don't know, who mentioned it first.

Q. By whom you don't know—

A. I don't know who would have mentioned it first. I'm sure we both would have thought of that, because it's an obvious thing to do.

Q. Now, at the time you did that, did you know of anyone else who had ever done. that in a gliding wing parachute before?

MR. JACOBSON: Done what, Mr. Zoda?

BY MR. ZODA:

Q. Imparted a transverse curvature in a spanwise direction by providing suspension lines the lengths of which were equal in any given transverse row?

A. That is—I'm sure you mean that to be a simple question. It really isn't. Are you talking about a Para-Foil-type of design or a parachute or both?

Q. No. I'm not talking about a parachute. I mean gliding wings, ram-air inflated.

A. Again, I'm not trying to be antagonistic. What do you mean by gliding wing? I want to give you the right answer. A parachute, like the Para-Commander is a flexible gliding device. A Para-Wing is a flexible gliding device and a Para-Foil is too, so by wing, do you mean of the Para-Foil type?

Q. I do mean of the Para-Foil type, a ram-air inflated type.

A. I was not aware of any other Para-Foil-type canopy or flexible gliding device that had a curvature with a spanwise direction to it prior to us doing this.

The Board Opinion

In affirming the rejections of all claims, the board stated:

In our opinion, the teachings of Berckmuller would have made it obvious to provide equal line lengths to arch the canopy of the prior Everett invention. The opinion of Poynter in his affidavit and the opinions of the applicants in their depositions, especially Vickery, reinforce our opinion as to obviousness. With respect to claims 2 and 12, we agree with the examiner that the description of the Barish sailwing in the October 1965 issue of *Sky-Diver* would have made it obvious to locate the Everett cells below the main panel.

OPINION

 Preliminarily, this case raises, for the first time, the question of how to treat affidavit and deposition evidence in protested reissue proceedings. *See* 37 CFR 1.175, 1.291. We conclude that such evidence is to

be treated in the same way as in the usual ex parte proceedings before the PTO.

 As to the rejections for obviousness, at least three factual inquiries must be made:

the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

*Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1965). Regarding the "differences between the prior art and the claims at issue," appellants' arguments are directed to two limitations found in claim 1: first, the requirement that the "suspension lines in each transversely extending row [be] substantially equal in length" and, second, the requirement that these lines "impart to said wing a contour which is transversely arched."[5]

With respect to the second requirement, appellants admit that "Everett's canopy was *broadly speaking*, transversely arched." It is well settled that claims before the PTO are to be given their "broadest reasonable interpretation consistent with the specification *during the examination of a patent application* since the applicant may then *amend* his claims, the thought being to reduce the possibility that, after the patent is granted, the claims may be interpreted as giving broader coverage than is justified." *In re Prater*, 56 CCPA 1381, 1395–96, 415 F.2d 1393, 1404–05, 162 USPQ 541, 550–51 (1969). Accordingly, the case turns on the obviousness of the first requirement—that the suspension lines in each transversely extending row be substantially equal in length—in contrast to the suspension lines of varied lengths in the transversely extending rows of Everett.

According to appellants, Domina Jalbert was a pioneer in the flexible gliding wing art and received one of the first patents on a gliding wing.[6] His device is patterned on

---

5. Appellants have not separately argued the limitations added by the dependent claims 2–12 and, therefore, these claims stand or fall based upon the limitations contained in independent

claim 1. *In re Burckel*, 592 F.2d 1175, 1179, 201 USPQ 67, 70 (Cust. & Pat.App.1979).

6. United States Patent No. 3,285,546, issued November 15, 1966.

an airplane wing, has a flat, as opposed to an arched, configuration, and, like appellants' wing, employs a series of ram-air scoops across the full transverse face of the leading edge of the wing. The scoops extend longitudinally from the leading to the trailing edge in order to "maintain the canopy and supply rigidity to the device." The Everett wing differs from Jalbert's and appellants' wings in that it has shorter ram-air scoops along only the middle portion of the leading edge in order to prevent that edge of the "parachute canopy from buckling downwardly and inwardly as the parachute travels forward during descent . . . so as to hold said edge distended and relatively stiff." Everett uses lengths of suspension lines which are "preferably varied to impart a predetermined contour to the parachute canopy and a predetermined angle of attack in flight." However, Everett does not disclose the reason for adopting this contoured feature.

Appellants' specification states that equal line lengths in transverse rows of suspension lines were adopted to give the wing—

> an arcuate or arched contour in a direction transversely of the wing. At the same time the wing may also be longitudinally curved or arched to impart a predetermined longitudinal cross section thereto by varying the length of the longitudinally spaced suspension lines 6*a*, 6*b*, etc. With this construction the load and forces applied to the suspension lines and wing are distributed more uniformly throughout the wing. In particular upon removal from a pack or launching sleeve the opposite sides or wing tips of the canopy are subjected to the same pull from the suspension lines as the central portion of the canopy by reason of the uniformity in length of the suspension lines. The danger of downward buckling of the wing at the center to present a V-shaped configuration on deployment is thereby eliminated. Moreover, after deployment of the canopy the load is so distributed that subsequent buckling of the wing upon oscillation or on change in the direction and velocity of the wind, is reduced to a minimum.

Appellants argue that they addressed the problem of buckling of the Jalbert wing *at its center* and that Everett did not recognize the cause of this problem but was only concerned with flutter of *the leading edge.*

With respect to the Berckmuller reference, this is cited by the PTO to support its conclusion that substitution of suspension lines of equal length for the lines of varied length in Everett would have been obvious.[7] However, the teachings of the references do not provide a suggestion for making such a substitution. *In re Lintner,* 59 CCPA 1004, 458 F.2d 1013, 173 USPQ 560 (1972). Berckmuller sought to solve the problem of reducing the operational altitude of parachutes by *flattening* the usual parachute dome, using suspension lines of equal length. On the other hand, appellants sought to avoid the problem of buckling of the Jalbert wing by adopting a more pronounced transverse *arched contour* and by using suspension lines of equal length in each transverse row. There would have been no reason to incorporate the equal line length concept of Berckmuller when seeking, as appellants did, to increase the arched contour of the wing rather than to flatten the contour as taught by Berckmuller.

However, the board stated that the Poynter affidavit and Vickery deposition "reinforce our opinion as to obviousness." We note that the increasing popularity of reissue protests has been accompanied by the PTO's consideration of evidence developed during infringement proceedings, including, as here, depositions and affidavits. In the usual ex parte proceeding, the PTO establishes a prima facie case of obviousness; the burden of proof then shifts to the applicant; if possible, the applicant then introduces by

7. Appellants argue that Berckmuller represents nonanalogous art. We disagree. The Berckmuller parachute is within the field of the inventors' endeavor, that is, it is an airborne device for supporting and guiding a load during descent. *In re Wood,* 599 F.2d 1032, 202 USPQ 171 (Cust. & Pat.App.1979). Analogous art may be combined. *In re Menough,* 51 CCPA 741, 323 F.2d 1011, 139 USPQ 278 (1963).

affidavit factual evidence of nonobviousness to try to rebut the prima facie case. *In re Palmer*, 59 CCPA 733, 451 F.2d 1100, 172 USPQ 126 (1971); *In re Antle*, 58 CCPA 1382, 444 F.2d 1168, 170 USPQ 285 (1971). The PTO is required to reconsider its prima facie case in light of the applicant's rebuttal evidence and must make a decision based upon the record as a whole. *In re Carleton*, 599 F.2d 1021, 202 USPQ 165 (Cust. & Pat. App.1979); *In re Rinehart*, 531 F.2d 1048, 189 USPQ 143 (Cust. & Pat.App.1976). Evidence submitted in a reissue protest proceeding should be considered on the same basis as other ex parte evidence. *See* 37 CFR 1.131 and 1.132.

Appellants argue that the Poynter affidavit cannot be used for any purpose because it was submitted on behalf of the defendant during the infringement proceedings, is uncorroborated, and its consideration would be contrary to the Supreme Court's decision in *The Barbed Wire Patent*, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1891).[8] However, the fact that Poynter executed the affidavit at the request of a protestor or an infringement defendant does not affect its admissibility—only the weight to be accorded it. *See Champion Spark Plug Co. v. Gyromat Corp.*, 603 F.2d 361, 367–68, 202 USPQ 785, 789 (CA 2 1979); *U. S. Philips Corp. v. Ferro Corp.*, 522 F.2d 1100, 1101–02, 187 USPQ 283, 284–85 (CA 6 1975); *In re Adams*, 53 CCPA 1433, 1438, 364 F.2d 473, 478, 150 USPQ 646, 649 (1966); *In re Guild*, 40 CCPA 996, 1000, 204 F.2d 700, 703, 98 USPQ 68, 71 (1953); *In re McKenna*, 40 CCPA 937, 942, 203 F.2d 717, 720, 97 USPQ 348, 350–51

(1953). Indeed, evidence produced during an inter partes proceeding can be more reliable and complete than that produced in an ex parte proceeding due to its adversary nature. *See In re McKenna, supra; In re Worrest*, 40 CCPA 804, 809 n.2, 201 F.2d 930, 933 n.2, 96 USPQ 381, 384 n.2 (1953).

As to corroboration, the statement of an expert's opinion set forth in an affidavit need not be corroborated. However, corroboration may be necessary for other statements. In this case, Poynter, as an inventor, made statements regarding his alleged prior reductions to practice using model wings similar to appellants' claimed invention. The credibility of such statements must be established by clear and convincing evidence.[9] *See Smith v. Hall*, 301 U.S. 216, 232–33, 57 S.Ct. 711, 718, 81 L.Ed. 1049 (1936); *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523 (1923); *The Barbed Wire Patent, supra*, 143 U.S. at 284–85, 12 S.Ct. at 447 (1891); *E. I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1261–62, 205 USPQ 1, 11–12 (CA 8 1980); *Stevenson v. ITC*, 612 F.2d 546, 550, 204 USPQ 276, 280 (Cust. & Pat.App. 1979); *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 75, 193 USPQ 449, 454 (Ct.Cl.1977). The Supreme Court described the problems associated with such evidence and the approach to be taken in evaluating it in *The Barbed Wire Patent, supra*, 143 U.S. at 284–85, 12 S.Ct. at 447, as follows:

> We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence

---

**8.** Appellants have also asserted that Poynter's statements should not be considered because there is no indication that Poynter's alleged invention was publicly known or used or not abandoned, suppressed or concealed. Due to our holding that Poynter's statements are entitled to no weight, we need not reach these alternative arguments.

**9.** The factors bearing on that credibility which must be considered are unrelated to the existence of the patent and include:
(1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user.
*E. I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1261 n.20, 205 USPQ 1, 11 n.20, (CA 8 1980).
This situation is analogous to an interference instituted as a result of a person filing an application after issuance of a patent in which he copies claims contained in the issued patent. In such a case, the person copying claims is required to establish a prior date of invention by clear and convincing evidence. *See Snitzer v. Etzel*, 531 F.2d 1062, 1065, 189 USPQ 415, 417 (Cust. & Pat.App.1976).

and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defense of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer. The doctrine was laid down by this court in *Coffin v. Ogden*, 18 Wall. 120, 124 [21 L.Ed. 821], that "the burden of proof rests upon him," the defendant, "and every reasonable doubt should be resolved against him. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation, it can-

not avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view."

Accordingly, we agree with appellant that Poynter's uncorroborated statements regarding his alleged prior invention are entitled to no weight.[10]

Poynter executed the affidavit more than ten years after building and testing his models. It was accompanied by undated and unwitnessed photographs of the models allegedly taken by Poynter while they were under test in the wind tunnel at Wright-Patterson Air Force Base. Poynter's presence at Wright-Patterson (but no actual wind tunnel testing) was established by his parachute jump log book, pages of which were also attached to the affidavit. The photographs and log book entries are the only corroborating evidence of record, and we are persuaded that they are insufficient to clearly and convincingly establish the credibility of Poynter's statements. For the most part, his statements are from memory. The ten-year lapse of time, due to the frailty of human memory, detracts from the credibility of the affiant. *See Lockheed Aircraft Corp. v. United States, supra* (five to six years); *Rex Chainbelt Inc. v. Borg-Warner Corp.*, 477 F.2d 481, 177 USPQ 549 (CA 7 1973) (eight years); *Goodrich v. Harmsen*, 58 CCPA 1144, 442 F.2d 377, 169 USPQ 553 (1971) (nine years); *Jones Knitting Corp. v. Morgan*, 361 F.2d 451, 149 USPQ 659 (CA 3 1966) (25 years). The photographs are incomprehensible and cannot be relied upon as contemporaneous documentary or physical evidence of the precise features asserted by Poynter. *See Lockheed Aircraft Corp. v. United States, supra.*

---

**10.** In an interference, corroboration of reduction to practice is required (*Mikus v. Wachtel*, 542 F.2d 1157, 191 USPQ 571 (Cust. & Pat.App. 1976); *Bennett v. Serota*, 477 F.2d 1385, 177 USPQ 753 (Cust. & Pat.App.1973)) in order to confirm the testimony of the inventor (*Beeber v. Krogh*, 56 CCPA 880, 403 F.2d 743, 159 USPQ 594 (1968)), show the truth or probabili-

ty of truth of his testimony (*Hasselstrom v. McKusick*, 51 CCPA 1008, 324 F.2d 1013, 139 USPQ 511 (1963)), or show the absence of fraud (*Berges v. Gottstein*, 618 F.2d 771, 205 USPQ 691 (Cust. & Pat.App.1980); *Berry v. Webb*, 56 CCPA 1272, 412 F.2d 261, 162 USPQ 170 (1969)).

Poynter, as an expert, stated his opinion on the ultimate legal issue.[11] This also is entitled to no weight. *In re Altenpohl*, 500 F.2d 1151, 1158, 183 USPQ 38, 44 (Cust. & Pat.App.1974); *In re Lindell*, 55 CCPA 707, 711, 385 F.2d 453, 456, 155 USPQ 521, 524 (1967). However, Poynter's factual statement regarding the state of the art, known to him in his capacity as an expert, *viz.*, that the use of equal line lengths to simplify manufacture was well-known as early as the 1920's, absent any contrary evidence, is entitled to full consideration. *In re Altenpohl, supra; In re Mochel*, 470 F.2d 638, 641, 176 USPQ 194, 196 (Cust. & Pat.App.1972).

Appellants contend that the Vickery deposition cannot be considered because his statements were made under subpoena for the infringement defendant and after he had left the employment of appellants' assignee; also, that his use of the term "obvious" was as a layman and not in the legal sense. However, the circumstances under which Vickery's statements were made merely bear on his credibility and the weight to be given his statements. Subpoenas are commonly used in adversary proceedings—even for a witness who might otherwise voluntarily appear. There is no indication that Vickery left the assignee's employment under unfavorable circumstances. There is no evidence by way of cross-examination or otherwise to indicate that he was a witness hostile to appellants, that he made inconsistent statements, or that he colored the facts because of prejudice against appellants. The statements in his deposition are admissible and, to the extent that they are factual or reflect an expert opinion which is not directed to the ultimate legal issue, they should be fully considered. Coming from a coinventor, the statements are probative and, at a minimum, constitute expert opinion evidence which supports the Poynter factual statement regarding the state of the art. We agree with appellants that use of "obvious," a legal term of art, by Vickery may be considered only as it is used in layman's parlance.

In addition to appellants' stated purpose to more effectively distribute the forces exerted on the suspension lines at the load points, it is clear that suspension lines of equal length serve another purpose. As indicated by the Poynter affidavit and the complementary Vickery deposition, it was well known and desirable at the time of appellants' invention to use suspension lines of equal length to simplify manufacturing and packing of any canopy. Berckmuller indicates that the packing of his parachute is "extremely simple." In light of Berckmuller, Poynter, and Vickery, we hold that substitution of suspension lines of equal length for the lines of varied length of Everett would have been obvious within the meaning of 35 U.S.C. § 103.

Appellants having failed to introduce objective evidence of nonobviousness,[12] the decision of the board must be *affirmed*.

*AFFIRMED.*

---

11. "[T]he simplest and most obvious technique for imparting a spanwise curvature to a gliding wing canopy was to utilize equal line lengths for the suspension lines."

12. There is no evidence to support appellants' assertion that they were the first to recognize the cause of the problem in Jalbert of inward and downward buckling at the center of the wing. Further, evidence of solution to problems in Jalbert would not be relevant, since comparisons to establish superior and unexpected results must be made with the closest prior art applied against the claims. *In re Boesch*, 617 F.2d 272, 276, 205 USPQ 215, 219 (Cust. & Pat.App.1980); *In re Holladay*, 584 F.2d 384, 386, 199 USPQ 516, 518 (Cust. & Pat.App.1978). The closest prior art here is the Everett wing.